1

2

3

4

5

6

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KEAMIA POWELL,<br><br>                    Plaintiff,<br><br>    v.<br><br>HERBERT SLEMP,<br><br>                    Defendant. | NO:  13-CV-0077-TOR<br><br>ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is Defendant's Motion for Summary Judgment (ECF No. 3).  The Court has reviewed the completed briefing and the record and files herein, and is fully informed.

BACKGROUND

Defendant Herbert Slemp, a sergeant with the Washington State Patrol, has moved for summary judgment on Plaintiff's Fourth Amendment excessive force claim on the grounds of qualified immunity.

///

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 1

1

FACTS

2        Defendant Herbert Slemp is a sergeant with the Washington State Patrol

3   ("WSP").  On September 24, 2010, Defendant and other officers arrived at a

4   residence in Spokane to execute a search warrant for controlled substances.

5   Defendant served as a "cover officer" during the initial entry, meaning that he was

6   responsible for covering other officers with his weapon drawn while they made

7   contact with anyone present in the residence.

8        Shortly after entering the residence, Defendant and another officer made

9   contact with Plaintiff Keamia Powell in her bedroom.  Plaintiff, who had been

10  awoken by the officers' early-morning entry, was wearing only underwear and a t-

11  shirt.  Defendant ordered Plaintiff to the ground at gunpoint.  Plaintiff complied,

12  lowering herself onto the floor.  Apparently satisfied that she did not pose an

13  immediate risk to their safety, the officers did not restrain Plaintiff in handcuffs.

14       At some point after the entire residence had been secured, Plaintiff asked

15  Defendant for permission to sit on her bed rather than lying on the floor due to the

16  fact that she was several months pregnant.  Defendant granted the request, and

17  Plaintiff moved from the floor to the bed.  Shortly thereafter, Plaintiff realized that

18  she had left a hydrocodone pill in plain sight on the nightstand next to her bed.

19  Knowing that possession of the pill violated the terms of her probation, and

20

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 2

wishing to avoid being caught, Plaintiff put the pill in her mouth and began to chew it.

Finding that she could not stand the chewed pill's bad taste, Plaintiff spit it back out into her hand. One of the officers in the room observed this behavior and alerted Defendant that Plaintiff appeared to be eating something. Realizing that she had been caught attempting to destroy potential evidence, Plaintiff immediately transferred the pill back into her mouth. Defendant then ordered Plaintiff to spit out the contents of her mouth.

Plaintiff rose from the bed, approached a nearby open window, and attempted to spit the pill out the window. Defendant was unsure of Plaintiff's purpose in approaching the window, but was purportedly concerned that Plaintiff might flee or destroy evidence. With his weapon still in his right hand, Defendant reached out to pull Plaintiff back from the window. At some point after making physical contact with Plaintiff, Defendant's weapon discharged. The bullet struck Plaintiff in the upper back, causing non-life threatening injuries.

The shooting incident was subsequently investigated by the WSP. Following the investigation, Defendant was administratively charged with violating the WSP's Lethal Force Policy and Firearm Policy. These charges were ultimately resolved by way of a settlement agreement in which Defendant admitted to violating the WSP's Firearm Policy by unintentionally discharging his weapon.

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 3

Defendant was suspended for one day and required to complete a battery of

retraining and recertification exercises.  This lawsuit followed.

DISCUSSION

**A. Summary Judgment Standard**

Summary judgment may be granted upon a showing by the moving party

"that there is no genuine dispute as to any material fact and that the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party

bears the initial burden of demonstrating the absence of any genuine issues of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then

shifts to the non-moving party to identify specific genuine issues of material fact

which must be decided by a jury.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 256 (1986).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury

could reasonably find for the plaintiff."  *Id.* at 252.

For purposes of summary judgment, a fact is "material" if it might affect the

outcome of the suit under the governing law.  *Id.* at 248.  A dispute concerning any

such fact is "genuine" only where the evidence is such that a reasonable jury could

find in favor of the non-moving party.  *Id.*  In ruling on a summary judgment

motion, a court must construe the facts, as well as all rational inferences therefrom,

in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372,

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 4

378 (2007).  Finally, the court may only consider evidence that would be

admissible at trial.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764 (9th Cir.

2002).

**B. Qualified Immunity**

Defendant has moved for summary judgment on the grounds of qualified

immunity.  Qualified immunity shields government actors from civil damages

unless their conduct violates "clearly established statutory or constitutional rights

of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S.

223, 231 (2009).  In evaluating an officer's assertion of qualified immunity, a court

must determine (1) whether the facts, viewed in the light most favorable to the

plaintiff, show that the officer's conduct violated a constitutional right; and (2)

whether the right was clearly established at the time of the alleged violation such

that a reasonable officer would have understood that his actions violated that right.

*Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).  The court may address these issues

in either order.  *Pearson*, 555 U.S. at 236.  If the answer to either inquiry is "no,"

then the officer is entitled to qualified immunity and may not be held personally

liable for his or her conduct.  *Glenn v. Washington Cnty.*, 673 F.3d 864, 870 (9th

Cir. 2011).

*///*

*///*

a.  <u>Violation of Constitutional Right</u>

The Ninth Circuit analyzes claims of excessive force by a police officer under the Fourth Amendment reasonableness standard described in *Graham v. Connor*, 490 U.S. 386 (1989).  *Coles v. Eagle*, 704 F.3d 624, 627 (9th Cir. 2012).  "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham*, 490 U.S. at 397.  Moreover, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must "allow for the fact that police officers are often forced to make split second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396-97.

Determining whether an officer's force was excessive or reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Id.* at 396.  In weighing the governmental interests at stake under *Graham*, a court should consider several factors, including: (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers and others, and (3) whether he is actively resisting arrest or attempting to

1   evade arrest by flight.  *Id.* at 396; *see also Mattos v. Agarano*, 661 F.3d 433, 441

2   (9th Cir. 2011) (explaining that the most important factor is whether the suspect

3   poses an immediate threat to the safety of the officers or others).  These factors are

4   not exclusive.  *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994).  Because

5   claims of excessive force often involve disputed factual contentions and competing

6   inferences to be drawn therefrom, the Ninth Circuit has cautioned that summary

7   judgment in excessive force cases "should be granted sparingly."  *Lolli v. Cnty. of*

8   *Orange*, 351 F.3d 410, 415-16 (9th Cir. 2003).

9        Defendant relies heavily upon *Luna v. Ridge*, 436 F. Supp. 2d 1163 (S.D.

10  Cal. 2006) for the proposition that an officer who accidentally shoots a suspect in

11  the process of attempting to physically restrain her cannot be liable under § 1983.

12  In *Luna*, a United States Border Patrol agent located a suspicious person in a

13  remote location near the Mexican border.  436 F. Supp. 2d at 1165.  Believing the

14  suspect to be a potential drug smuggler, the agent drew his service weapon and

15  prepared to contact the suspect.  *Id.*  When the agent approached the suspect and

16  identified himself as law enforcement, the suspect turned and fled.  *Id.*  The agent

17  gave chase with his weapon still in hand.  *Id.*  After a short pursuit, the agent

18  caught up with the suspect and wrestled him to the ground.  *Id.*  A struggle ensued,

19  and the agent's arms and service weapon became pinned between the ground and

20

the suspect's chest. *Id.* As the agent attempted to extricate his arms, his service

weapon accidentally discharged and wounded the suspect in the thigh. *Id.*

In the ensuing excessive force lawsuit, the agent moved for summary

judgment on the issue of qualified immunity. The district court granted the

motion, finding that no constitutional violation had occurred. *Id.* at 1172. In

reaching this decision, the district court emphasized that the plaintiff had failed to

demonstrate that the shooting was anything other than accidental. *Id.* at 1171. In

the absence of evidence that the agent "intentionally discharged his weapon," the

court reasoned, the plaintiff could not prevail on his claim that the shooting was an

unreasonable use of force. *Id.*

Although *Luna* presents closely analogous facts, it does not support

Defendant's position. Notably, the excessive force claim in *Luna* was predicated

solely upon the theory that the agent fired his weapon under circumstances which

did not warrant the deliberate use of deadly force. As the district court explained,

> "[B]eing shot" is the sole foundation of [Luna's] Fourth Amendment
> claim . . . The reasonableness of [the agent] having drawn his gun in
> these circumstances and location while waiting for the opportunity to
> apprehend Luna, *or later the use of his hands to seize Luna while still
> holding the gun*, are not challenged in the [complaint] as
> unconstitutionally unreasonable conduct.

*Id.* at 1171 (emphasis added) (footnote omitted); *see also id.* at 1166 n. 3 ("The

shooting is the only conduct alleged in support of the Fourth Amendment claim.").

Under this narrow theory of liability, the district court reasoned, the plaintiff's only

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 8

1  means of establishing excessive force was to prove "that the shooting was both

2  intentional and unreasonable." *Id.* at 1170 (citing *Brower v. Cnty. of Inyo*, 489

3  U.S. 593, 596-97 (1989)); *see also id.* at 1173 ("Luna's burden to overcome

4  qualified immunity is to show [that the defendant's] conduct in the circumstances

5  involved a seizure effectuated by an intentional shooting when deadly force was

6  not necessary.").

7       Unlike in *Luna*, Plaintiff has not alleged that *the shooting itself* was

8  unconstitutional.  Rather, Plaintiff's primary theory of liability is that Defendant

9  used excessive force by restraining her in a manner which he either knew or should

10  have known might result in an accidental discharge of his weapon.  *See* Pl.'s FAC,

11  ECF No. 1, at ¶¶ 25-32.  Specifically, the First Amended Complaint alleges (1) that

12  the WSP has a policy prohibiting its officers from physically restraining suspects

13  while holding a weapon; (2), that the policy is specifically designed to prevent the

14  officer from inadvertently shooting a suspect during a physical struggle; (3) that

15  Defendant was aware of the policy and understood the danger it was specifically

16  designed to prevent; and (4) that Defendant made a conscious decision to take

17  action which violated the policy, thereby subjecting Plaintiff to an unreasonable

18  risk of serious bodily injury or death.  Pl.'s FAC, ECF No. 1, at ¶¶ 25-27, 29, 32.

19  Given that the *Luna* court was careful to explain that it had not been presented with

20

1   similar allegations, there is reason to believe that it would have reached a different

2   result on the theory advanced by Plaintiff in this case.

3         Nor is the Court persuaded that Plaintiff's citations to *Torres v. City of*

4   *Madera* ("*Torres II*"), 648 F.3d 1119 (9th Cir. 2011), and *Henry v. Purnell*, 652

5   F.3d 524 (4th Cir. 2011) are particularly instructive.  As Defendant correctly notes,

6   both of these cases involve officers mistakenly drawing their firearms instead of

7   their tasers, with tragic results.  The type of "mistake" at issue in these cases is

8   materially different from the "mistake" alleged to have been made in this case.

9   Whereas the officers in *Torres II* and *Purnell* made a mistake in *perception—i.e.*,

10  mistaking their firearms for their tasers—Defendant is alleged to have made a

11  mistake in *judgment*.  As noted above, Plaintiff's theory of the case is that

12  Defendant knowingly exposed her to a risk of accidental injury or death that was

13  unreasonable under the circumstances.  In other words, Plaintiff's theory is that

14  Defendant simply should have "known better" than to physically restrain her with

15  a weapon in hand when she posed no immediate risk to his safety.

16        This theory of liability is not particularly compatible with the "mistaken

17  perception" line of cases, which focus on the reasonableness of the officer's

18  mistake of *fact* under the totality of the circumstances.  *See Torres II*, 648 F.3d at

19  1124 ("[I]f Officer Noriega knew or should have known that the weapon she held

20  was a Glock rather than a Taser, and thus had been aware that she was about to

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 10

discharge deadly force on an unarmed, non-fleeing arrestee who did not pose a significant threat of death or serious physical injury to others, then her application of that force was unreasonable."). Instead, the Court views the traditional *Graham* analysis as the better approach. Under that analysis, the relevant inquiry is simply whether Defendant's decision to physically restrain Plaintiff while holding a weapon was a reasonable use of force under the totality of the circumstances.

The Court concludes that a jury applying the *Graham* standard could find in Plaintiff's favor. Notably, it is undisputed that Defendant understood the risk of his weapon accidentally discharging under the precise conditions at issue. In his Answer, Defendant admits that officers are specifically trained to avoid restraining a suspect while holding a firearm whenever possible, *see* Def.'s Answer to Pl.'s FAC, ECF No. 2, at ¶ 25, and that the purpose of this training is to minimize the risk of a suspect being inadvertently shot, *see* Def.'s Answer to Pl.'s FAC, ECF No. 2, at ¶¶ 26-27 ("The training provided indicates that avoiding physical contact with a suspect while a service weapon is drawn may reduce the risk of the suspect taking control of the officer's weapon and may reduce the risk of an accidental discharge of the weapon."). Defendant further conceded in his deposition that he received this training and understood the risks prior to restraining Plaintiff on September 24, 2010. Slemp Dep., ECF No. 5-1, at Tr. 21-22, 28, 44.

A reasonable jury could find that Defendant's use of this risky tactic was not warranted under the totality of the circumstances.  When viewed in the light most favorable to Plaintiff, the evidence suggests that Plaintiff did not pose a threat to Defendant's safety, that she was not committing a particularly serious offense (or *any* offense for all Defendant knew at the time), and that she likely could not have escaped through the 18-inch wide window in her bedroom.  When viewed in this context, the evidence tends to suggest that Defendant pulled Plaintiff back from the window for the sole purpose of attempting to prevent her from disposing of suspected contraband.  A jury must decide whether Defendant's decision to restrain Plaintiff without re-holstering his weapon was warranted under these circumstances.  *See Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1166-67 (9th Cir. 2011) ("[I]t it is rarely necessary, if ever, for a police officer to employ substantial force without warning against an individual who is suspected only of minor offenses, is not resisting arrest, and, most important, does not pose any apparent threat to officer or public safety."); *Espinosa v. City and Cnty. of San Francisco*, 598 F.3d 528, 537-38 (9th Cir. 2010) (approaching suspect with weapons drawn unreasonable where suspect had not been accused of any crime, presented no danger to the public, and did not pose a plausible escape risk) *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1013-14 (9th Cir. 2002) (training weapons on unarmed misdemeanor suspect unreasonable).  Accordingly,

Defendant is not entitled to summary judgment on the first prong of the qualified immunity analysis.

      b. <u>Clearly Established Law</u>

      The second prong of the qualified immunity analysis requires the Court to decide whether the right alleged to have been violated was clearly established on September 24, 2010. For a right to be "clearly established," for purposes of the qualified immunity analysis, the right

> must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citations omitted). In other words, there is no requirement that previous cases be "fundamentally similar" to the facts alleged in a particular case. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). All that is required is that the defendant had "fair warning" from existing precedent that his conduct was unlawful. *Id.*

      As the Supreme Court explained in *Anderson v. Creighton*, the outcome of a court's "clearly established right" analysis frequently turns upon "the level of generality at which the relevant 'legal rule' is to be identified." 483 U.S. 635, 639 (1987). Thus, before attempting to decide whether a right was clearly established at the time of the alleged violation, a court must attempt to "define the contours of

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 13

1  the right allegedly violated in a way that expresses what is really being litigated."

2  *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1158 (9th Cir. 2000).

3       Having carefully reviewed the record and the parties' respective arguments,

4  the Court will define the right at issue as the right to be free from force which

5  poses an unreasonable risk of inadvertent death or serious bodily harm.  This

6  definition adequately reflects Plaintiff's theory of the case (*i.e.*, that Defendant

7  unreasonably restrained her in a manner which he either knew or should have

8  known might result in an accidental discharge of his weapon), while also honoring

9  Defendant's position that the level of force used was reasonable *despite* the

10  inherent risk to Plaintiff's safety.

11       The Court concludes that the right to be free from force which poses an

12  unreasonable risk of inadvertent death or serious bodily harm was clearly

13  established as of September 24, 2010.  *Graham* mandates that police officers

14  balance "the nature and quality of the intrusion" against the need to detain a

15  suspect in a particular circumstance.  490 U.S. at 396.  As the Supreme Court

16  explained in *Scott v. Harris*, officers performing this balancing must necessarily

17  account for *foreseeable risks*—including the possibility that the suspect might be

18  seriously injured or killed—when selecting an appropriate level of force.  550 U.S.

19  372, 384.  When the force to be used poses "a high likelihood of serious injury or

20  death to [the suspect]," the officer's actions must be reasonable in view of "the

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 14

threat to the public that [the officer] was trying to eliminate." *Id.* at 383-84.  The

fact that the officer does not *intend* to seriously injure or kill the suspect is

irrelevant; to the extent that the risk of serious injury or death was foreseeable, the

officer must account for it.  *Id.*; *see also Brower*, 489 U.S. at 598-99 (explaining in

dicta that an officer may be liable for seizing a suspect "by the accidental discharge

of a gun with which [the suspect] was meant only to be bludgeoned, or by a bullet

in the heart that was meant only for the leg").

Similarly, the Ninth Circuit has consistently ruled that officers must account

for the unintended—though reasonably foreseeable—consequences of their

actions.  *See, e.g.*, *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001)

(holding that the firing of "beanbag" round at a suspect who posed no immediate

risk to the officer's safety was unreasonable where the officer knew or should have

known that the suspect could be seriously injured if the round missed its target);

*Bryan v. MacPherson*, 630 F.3d 805, 825 (9th Cir. 2010) (stating that an officer

must account for the "foreseeable risk of physical injury" caused by a suspect's

"sudden and uncontrolled fall" after being hit by a taser in dart mode);[1] *Nelson v.*

---

[1] This case was decided on November 30, 2010, some five weeks after the events
at issue in this case.  The relevant holding, however, was announced in a prior
iteration of the opinion which was published on December 28, 2009.  *See Bryan v.*
*MacPherson*, 590 F.3d 767, 774 (9th Cir. 2009), *superseded by Bryan v.*

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 15

1  *City of Davis*, 685 F.3d 867, 883-87 (9th Cir. 2012) (denying qualified immunity to

2  officers who deployed "pepperball projectiles" against rowdy partygoers in 2004

3  due to foreseeable risk that projectiles might strike and seriously injure partygoers

4  in a vulnerable area such as the eye).  The Court concludes that these authorities

5  are sufficient to have put Defendant on notice that his alleged conduct was

6  unconstitutional.  Accordingly, Defendant is not entitled to qualified immunity.

7  **IT IS HEREBY ORDERED:**

8      Defendant's Motion for Summary Judgment (ECF No. 3) is **DENIED**.

9      The District Court Executive is hereby directed to enter this Order and

10  provide copies to counsel.

11      **DATED** April 22, 2013.

12

13                        THOMAS O. RICE
                       United States District Judge

14

15

16

17

18
_____

19  *MacPherson*, 608 F.3d 614 (9th Cir. 2010), *withdrawn and superseded on denial*

20  *of reh'g by Bryan v. McPherson*, 630 F.3d 805 (9th Cir. 2010).

ORDER DENYING MOTION FOR SUMMARY JUDGMENT ~ 16